IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RICKY ALAN WEGERER,

                Plaintiff,

v.                                                           OPINION and ORDER

KILOLO KIJAKAZI,                                     22-cv-123-jdp
Acting Commissioner of the Social Security
Administration,

                Defendant.

---

      Plaintiff Ricky Alan Wegerer has back and shoulder impairments that prevent him from performing his job as an industrial maintenance worker. After leaving his job, Wegerer applied for disability insurance benefits through the Social Security Administration. After a hearing, an administrative law judge found that Wegerer's condition prevented him from returning to his previous job. But the ALJ denied his application after finding that he could still perform a significant number of other jobs in the national economy. The ALJ's finding was supported by the testimony of a vocational expert, who testified that an individual of Wegerer's age, education, past work experience, and physical limitations would be able to perform an estimated 23,600 jobs in the national economy. The vocational expert derived her estimates from Job Browser Pro, a software program used with increasing frequency by vocational experts in estimating the number of relevant jobs in the national economy.

      Wegerer now appeals. He argues that: (1) the ALJ did not do enough to ensure that the vocational expert's Job Browser Pro-derived estimates were reliable; and (2) the ALJ's conclusion that 23,600 constitutes a "significant" number of jobs is not supported by substantial evidence. Both of these issues present close calls: the vocational expert's testimony

concerning the reliability of her job estimates was not robust and the number of jobs was at the low end of what courts in this circuit have found to be significant. Even so, the court is satisfied that reasonable people could agree with the ALJ's conclusions, so her decision clears the low substantial evidence standard of review. Accordingly, the court will affirm the decision.

BACKGROUND

Wegerer applied for disability insurance benefits on December 19, 2019, alleging that he had been disabled since May 24, 2019. He alleged that he was unable to work because of degenerative disc disease in this back, impingement syndrome in both shoulders, and obesity. R. 372.[1] Before applying for disability, he had worked as an industrial maintenance repairer. Through his past work, Wegerer acquired a number of skills, including electrical, welding, using hand tools, inspecting machinery and parts, and building maintenance. R. 60.

Establishing disability under the Social Security Act depends on a number of vocational factors, including the claimant's age, education, work experience, and "residual functional capacity," which is "the most you can still do despite your limitations." 20 C.F.R. § 404.1545; § 404.1520(g). At the time he applied for benefits, Wegerer was 54 years old, placing him into the "closely approaching advanced age" category. § 404.1563(d). He turned 55 on April 17, 2020, at which time he moved into the "advanced age" category. § 404.1563(e).

The local disability agency denied his application, and Wegerer appealed. In July 2021, he appeared with representation at a telephonic administrative hearing. The ALJ heard testimony from Wegerer and from Monika Dabrowiecka, an impartial vocational expert with

---

[1] Record cites are to the administrative transcript, located at Dkt. 9.

2

more than 20 years' experience as an employment specialist or vocational rehabilitation consultant. R. 368. Wegerer did not object to Dabrowiecka's qualifications, but in a pre-hearing brief and letter, he objected to any vocational testimony regarding job numbers. R.192, 372.

The ALJ posed two hypotheticals to Dabrowiecka. The first asked her to assume an individual of Wegerer's age at the time of his application (54), education, and work experience who could perform unskilled work at the light level of exertion with: occasional climbing, stooping, twisting, crouching, or crawling, and occasional reaching overhead bilaterally. R. 59. Dabrowiecka testified that such an individual would be unable to perform Wegerer's past work, but could perform light, unskilled jobs such as production assembler (59,000 jobs nationally), marker (129,000 jobs nationally), and cashier (570,000 jobs nationally).

In the second hypothetical, the ALJ asked Dabrowiecka to assume the same limitations but to account for Wegerer's change in age category on April 17, 2020, and his transferable skills. Dabrowiecka testified that such an individual could perform the following jobs, as listed in the *Dictionary of Occupational Titles*: (1) wire assembler, DOT No. 728.684-010 (12,000 jobs nationally), electronic soderer, DOT No. 813.684-030 (10,000 jobs nationally), and light fixture assembler, DOT 723.684-014 (1,600 jobs nationally).

On cross-examination, Wegerer's counsel asked Dabrowiecka how she arrived at her job number estimates. R. 64. Dabrowiecka responded that the source of her numbers was SkillTRAN's Job Browser Pro, a computer program. Dabrowiecka said she had "set the program" to provide only full-time jobs but otherwise had not made any modifications or adjustments to the numbers supplied by the program. Responding to counsel's question

3

whether Dabrowiecka knew "generally" how the program estimates job numbers, Dabrowiecka responded:

> I believe there are three different methods of calculating or estimating numbers. The data is being reported by the government, the government data that is collected by the government. So, SkillTrans, Job Browser uses that data to estimate numbers. And those numbers are just being projections, industry projections updated biannually. And SkillTrans estimates their numbers of jobs per the specific DOT occupation, not per the OES group. And estimation—the JBT estimate that pertain to occupational density and also the frequency within specific OES occupation that was found within each industry. And eventually, that percentage is being facilitated within each DOT level.

R. 65. Counsel did not ask any follow-up questions or object to Dabrowiecka's job numbers.

The ALJ followed up by asking Dabrowiecka if people working in the field of vocational rehabilitation generally considered Job Browser Pro to be a reliable source of job numbers. *Id*. Dabrowiecka responded that the program was being widely used by career counselors, vocational experts, and job developers. *Id*.

On August 30, 2021, the ALJ issued a written decision denying Wegerer's request for benefits, following the five-step sequential evaluation process set forth in the regulations. *See* 20 C.F.R. § 404.1520(a)(4). R. 14–27. Working through the first four steps, the ALJ found that Wegerer had severe impairments that, while not presumptively disabling, imposed limitations that limited Wegerer to working at the light level of exertion, with some additional postural and reaching limitations that aren't in dispute. Wegerer's past work was heavy, so the ALJ found Wegerer had met his burden at step four to show that he couldn't perform his past work.

The ALJ proceeded to consider at step five whether Wegerer could adjust to other work in the national economy, accounting for his age, education, work experience, and residual

4

functional capacity. 20 C.F.R. § 404.1520(a)(4)(v). Relying on Dabrowiecka's testimony, the ALJ found that, although Wegerer had limitations that prevented him from performing his past work, there were a substantial number of jobs existing in the national economy that Wegerer could perform, both before and after his 55th birthday. R. 24–26. Addressing Dabrowiecka's methodology for estimating job numbers, the ALJ found it reliable, citing Dabrowiecka's knowledge and experience in job placement, her "cogent and thorough" responses to the questions asked at the hearing, and her testimony that "Skill Trans [sic] is considered reliable by experts in her field for use of determining job numbers and availability." R. 26.

Accepting without question that 23,600 was a "significant number" of jobs sufficient to meet the commissioner's burden at step five of the sequential analysis, the ALJ found Wegerer not disabled. The Appeals Counsel subsequently denied Wegerer's request for review, making the ALJ's decision the final decision of the commissioner. Wegerer now appeals.

ANALYSIS

On appeal, Wegerer challenges only the ALJ's finding that he was not disabled after his change in age category on April 17, 2020. He contends that the ALJ erred by: (1) finding Dabrowiecka's job numbers reliable; and (2) concluding that 23,600 is a "significant" number of jobs in the national economy. Because of these errors, Wegerer contends, the Acting Commissioner did not meet her burden at step five of showing that Wegerer can adjust to substantial gainful work that exists in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(B); *Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

The court notes at the outset that Wegerer did not raise these objections at the administrative hearing or in a post-hearing brief. The Seventh Circuit has held that to preserve

objections to the vocational expert's testimony for appeal, the claimant must raise a specific objection at the hearing or in a post-hearing brief; general objections raised in a pre-hearing brief are insufficient. *See Fetting v. Kijakazi*, 62 F.4th 332, 337 (7th Cir. 2023). But the ALJ apparently deemed Wegerer's pre-hearing brief challenging the reliability of the VE's job numbers sufficient, because she addressed the VE's methodology in her decision. R. 26. And the acting commissioner has expressly declined to argue forfeiture. Dkt. 19, at 9, n. 5. So, the merits of Wegerer's objections are properly before the court. *Wilder v. Kijakazi*, 22 F.4th 644, 652 n. 8 (7th Cir. 2022) (commissioner can waive waiver). Nevertheless, Wegerer's failure to present the ALJ with any critique of the VE's methodology or competing evidence does not leave him in a strong position to argue that the ALJ should have demanded more.

This court's role is to review the ALJ's decision for legal errors and to determine whether the decision is supported by substantial evidence. *See Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). Substantial evidence is "more than a mere scintilla" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). Moreover, the court's inquiry "defers to the presiding ALJ, who has seen the hearing up close." *Id*. at 1157.

### A.  Reliability of the VE's testimony concerning job numbers

"With respect to a vocational expert's testimony about job prevalence, 'the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method.'" *Case v. Kijakazi*, No. 22-2379, 2023 WL 4882880, at *3 (7th Cir. Aug. 1, 2023) (quoting *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018)). A "precise count" of job numbers is not necessary, *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020), but "any method that the agency uses to estimate job numbers must be supported with evidence sufficient to

6

provide some modicum of confidence in its reliability." *Chavez*, 895 F.3d at 969. For instance, the VE could draw on her "knowledge of labor or market conditions and occupational trends, gleaned from reviewing data sources or placing workers in jobs." *Id*. at 970. A reviewing court's inquiry into the reliability of VE testimony "is case-by-case" and should "take[ ] into account all features of the vocational expert's testimony, as well as the rest of the administrative record." *Biestek*, 139 S. Ct. at 1157.

In this case, Dabrowiecka explained that she used SkillTRAN's Job Browser Pro software as a source of her job estimates. According to SkillTRAN's website, the software uses a method of estimating job numbers for a particular DOT code using data from the Department of Labor's Occupational Employment Survey (OES) that avoids the flaws of oft-criticized "equal distribution method."[2] (For a discussion of the equal distribution method and its flaws, *see, e.g., Alaura v. Colvin*, 797 F.3d 503, 507–08 (7th Cir. 2015), and *Westendorf v. Saul*, No. 19-CV-1019-JDP, 2020 WL 4381991, at *2 (W.D. Wis. July 31, 2020)). As other courts have noted, the program is "widely relied upon by vocational experts in estimating the number of relevant jobs in the national economy." *Purdy v. Berryhill*, 887 F.3d 7, 14 (1st Cir. 2018).

Neither the Seventh Circuit nor this court has found as a matter of law that Job Browser Pro employs reliable methods. Instead, this court has held that when a vocational expert relies on numbers derived from Job Browser Pro, "the VE needs to be able to explain how Job Browser Pro makes its job number estimates, how she used the software to generate her own estimates, and why she believes those estimates are reliable." *Staples v. Kijakazi*, No. 21-CV-379-JDP, 2023 WL 2753855, at *5 (W.D. Wis. Apr. 3, 2023); *Westendorf*, 2020 WL 4381991, at *4.

---

[2] https://skilltran.com/pubs/DOTempnum_method.pdf (last visited Sept. 28, 2023).

This does not mean that the VE must be able to "precisely explain the software's algorithms[.]" *Case*, 2023 WL 4882880, at *3. But the VE's explanation of her methodology must be "reasoned and principled" enough to instill some confidence that the estimate was not "conjured out of whole cloth." *Ruenger v. Kijakazi*, 23 F.4th 760, 763 (7th Cir. 2022) (internal quotations and citations omitted). In addition, if the claimant raises substantive objections to the reliability of Job Browser Pro's methods, the ALJ must address them on the merits. *Staples*, 2023 WL 2753855, at *5; *Westendorf*, 2020 WL 4381991, at *3.

It's a close question, but the court concludes that the ALJ did not err in accepting the VE's testimony in this case. Dabrowiecka's testimony was a bit jumbled, but it demonstrates that she generally understood the method that the software used to generate its DOT–specific estimates.[3] She explained that it used government data and industry projections to generate DOT–specific estimates based on occupational density and the frequency with which specific OES occupations were found within each industry. Although she used some jargon, the terms were those commonly used by vocational experts at disability hearings and with which the ALJ and plaintiff's counsel—a specialist in disability law—would have been familiar.[4] As for how she used the program, she said she directed the program to estimate full-time jobs, but did not supply any other modifications or restrictions. With respect to the program's reliability, she testified that the program was being "widely used" by vocational rehabilitation specialists. *See,*

---

[3] To be fair to the ALJ, the court acknowledges that the hearing was conducted telephonically and the transcript indicates that some parts of Dabrowiecka's testimony were inaudible. R. 62, 63, 64. So it's possible that the transcript does not reflect exactly what she said.

[4] Plaintiff was represented at the hearing by Roger Rustad. According to his firm's website, he's an attorney at Duncan Disability Law, S.C.. Available at https://www.duncandisability.com (visited Sept. 28, 2023).

*e.g., Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (testimony that source was widely recognized as acceptable in the field of vocational rehabilitation supported its reliability); *Irwin v. Berryhill*, No. 1:17-CV-00408-SLC, 2018 WL 5873877, at *14 (N.D. Ind. Nov. 8, 2018) (reliability of VE's testimony was supported by his testimony that "Job Browser Pro is widely accepted and relied upon by vocational experts."); *Wright v. Colvin*, No. 14-cv-1113-CJP, 2015 WL 72933319, at *6 (S.D. Ill. Nov. 19, 2015) (remanding ALJ's step-five finding where there was no testimony by the VE that Job Browser Pro was widely accepted and relied upon by vocational experts). And finally, unlike the claimants in *Staples* and *Westendorf*, Wegerer did not raise any substantive challenges to the software or press Dabrowiecka for a more robust explanation of how it worked. Taking into account all the features of Dabrowiecka's testimony, including her demonstrated familiarity with the software, the underlying sources it used, the general process by which it estimated DOT-specific job numbers and its widespread use by vocational rehabilitation specialists, the ALJ reasonably concluded that her estimates were not "conjured out of whole cloth."

On appeal, Wegerer argues that reversal is required because Dabrowiecka testified that Job Browser Pro used the problematic "equal distribution method." Dkt. 17, at 33. This is incorrect. Dabrowiecka did not testify that the program used that method; the term was never even mentioned at the hearing. Dabrowiecka testified, consistent with information on SkillTRAN's website, that Job Browser Pro uses an occupational density method of estimating job numbers by DOT title. And in any case, the Seventh Circuit has never enjoined the use of the equal distribution method. *Ruenger v. Kijakiazi*, 23 F. 4th 760, 764 (7th Cir. 2022).

Wegerer further argues that the ALJ erred in accepting Dabrowiecka's estimates because she did not explicitly buttress them with her own observations and professional experience. It

is true that in some cases affirming Job Browser Pro-generated estimates, courts have emphasized that the VE relied on her own experience as a "cross-check" on the reliability of the Job Browser Pro estimates. *E.g., Case*, 2023 WL 4882880, at *3 ("When questioned, the vocational expert explained that his estimates were not only the product of the software, but also of his experience providing job counseling, his prior research, and his observations of the jobs in question."); *Kenealy v. Saul*, No. 19-cv-40-jdp, 2019 WL 6463840 (W.D. Wis. Dec. 2, 2019) (VE compared estimates derived from Job Browser Pro with estimates derived through the equal-distribution method and then arrived at ballpark estimates based on her experience and expertise). Here, although Dabrowiecka relied on first-hand knowledge and experience to buttress her testimony concerning the reaching requirements of the jobs she identified, R. 63, 66, she did not expressly cite her experience as a reason for finding the Job Browser Pro estimates reliable.

Testimony from Dabrowiecka indicating that she brought her own experience to bear in assessing the reliability of the Job Browser Pro estimates would have gone a long way towards supporting the ALJ's step-five finding. Even so, the court does not find that omission fatal in this case. The Supreme Court has eschewed categorical rules in disability cases and emphasized that whether a VE's testimony clears the "more-than-a-mere-scintilla threshold" must be decided case-by-case. *Biestek*, 139 S. Ct. at 1157. Dabrowiecka had 20 years' experience as a vocational rehabilitation or job placement specialist and her qualifications were unchallenged. Her testimony indicates that she used Job Browser Pro on a regular basis, that she understood its methodology and the sources on which it relied, and that it was widely used by others in her field. And Wegerer hasn't presented or identified any evidence that contradicted her testimony. Giving the proper deference to the ALJ, along with the absence of a pointed

challenge to Dabrowiecka's testimony at the administrative level, the court is satisfied that Dabrowiecka's testimony about how Job Browser Pro generated its estimates, combined with its widespread use in the field of vocational rehabilitation, provided sufficient indicia of reliability to clear the low substantial evidence standard.

**B.  Sufficiency of job numbers**

At step five of the sequential evaluation, the commissioner bears the burden to show that the claimant can adjust to other jobs existing in significant numbers in the national economy, either in the region where the claimant lives or in several regions in the country. 20 C.F.R. § 404.1560(c). The applicable regulation explains the significant numbers requirement as follows:

> (a) General. We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether—
>
> (1) Work exists in the immediate area in which you live;
>
> (2) A specific job vacancy exists for you; or
>
> (3) You would be hired if you applied for work.
>
> (b) How we determine the existence of work. Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy". We will not deny you disability benefits on the basis of the existence of these kinds of jobs. If work that you can do does not exist in the national economy, we will determine that you are disabled. However, if work that you can do does exist in the national economy, we will determine that you are not disabled.

20 C.F.R. § 404.1566. The regulation further provides that a claimant's unemployment because of an inability to get to work, lack of work in the local area, the hiring practices of employers, and other factors specific to the claimant's employability is irrelevant. 20 C.F.R. § 404.1566(c).

Congress didn't define the term "significant" in the Social Security Act, and the commissioner hasn't done so by rule. *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022), cert. denied sub nom. *Moats v. Kijakazi*, 143 S. Ct. 785 (2023). Both the Supreme Court and the Seventh Circuit have rejected a categorical approach to the question of how many jobs constitute a significant number. *Milhem v. Kijakazi*, 52 F.4th 688, 695 (7th Cir. 2022) ("Our circuit's case law does not provide a clear baseline for how many jobs are needed[.]"). Instead, the Seventh Circuit has held that it is "within the ALJ's discretion to determine whether jobs exist only in very limited numbers," a determination that "does not depend upon the establishment of a standard for significance." *Id.* ALJs typically ask vocational experts for their opinion on the number of jobs in the national economy that claimants can perform; whether that number is "significant" is up to the ALJ. *DuCharme v. Kijakazi*, No. 21-2204, 2022 WL 3287974, at *3 (7th Cir. Aug. 11, 2022). The ALJ's answer is a factual finding that the court reviews under the substantial evidence standard. *Ruenger*, 23 F. 4th at 763.

Wegerer argues that, in the absence of bright-line rules, the ALJ could not simply declare 23,600 jobs to be significant without analysis or discussion. In his view, there ought to be at least some kind of standard or analysis that the ALJ must undertake to decide whether the number of jobs identified by the vocational expert is "significant." He urges the court to adopt the following test from the Eighth Circuit, which in turn quoted the following language from a Sixth Circuit case, *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988):

12

> A judge should consider many criteria in determining whether work exists in significant numbers, some of which might include: the level of claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on.

*Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (quoting *Hall*, 837 F. 2d at 275).

The court agrees that it would be helpful to have more guidance from either the courts or the commissioner as to how significance should be determined. But Wegerer doesn't cite any case from the Seventh Circuit adopting the *Hall* factors. To the contrary, the court in *Milhem* expressly *rejected* the argument that "the ALJ's step-five decision was erroneous because neither the Commissioner nor the ALJ presented a standard by which significance is to be assessed." 52 F.4th at 694; *see also Kuhn v. Kijakazi*, No. 22-1389, 2022 WL 17546947, at *2 (7th Cir. Dec. 9, 2022) (noting that *Milhem* "squarely addressed and rejected" the argument that the statutory concept of significance must have a standard).

Instead, rather than articulating a standard for significance or stating that a certain number of jobs is significant, the court in *Milhem* simply considered whether the ALJ's decision at step five was based upon substantial evidence. *Id*. at 696. The court found that the ALJ "grounded her conclusion that the number of jobs mentioned was 'significant' on her consideration of [Milhem's] age, education, work experience, and [RFC] and that [Milhem] was capable of making a successful adjustment to work that exists in the economy." *Id*. The court also found that the ALJ's decision reflected an assessment of "the tolerance of absences in [the identified] positions, the requirements for being on task in the workplace, and the frequency of breaks." *Id*. For these reasons, the court found that "a reasonable person would accept 89,000 jobs in the national economy as being a significant number." *Id*., *see also Kuhn*,

13

2022 WL 17546947 at *3 (finding that substantial evidence supported the ALJ's finding that 89,000 was significant based on the identical analysis).

Following that approach here, the court is satisfied that substantial evidence exists for the ALJ to have found 23,600 jobs nationwide "significant." The ALJ grounded her conclusion that 23,600 jobs was significant on her consideration of Wegerer's "age, education, work experience, and residual functional capacity" and that Wegerer had acquired work skills from past relevant work that were transferable to other occupations. R. 24. Dabrowiecka's responses to both the ALJ's and counsel's questions about Wegerer's transferable skills were persuasive and reflected that she had a cogent understanding of Wegerer's past work as well as the demands of the positions to which those skills could be transferred. R. 62–64. And Wegerer raises no challenge to the ALJ's conclusion that he could perform light work with no overhead reaching. Finally, although it's on the low side, 23,600 jobs nationwide falls within the range that courts in this circuit, including this one, have found significant. *DuCharme*, 2022 WL 3287974, at *3 (30,000 jobs nationwide significant) (citing *Moats*, 42 F.4th at 563, in turn listing appellate cases affirming national numbers ranging from 500 to 6,000); *Sommerfeldt v. Kijakazi*, 21-cv-83-jdp (W.D. Wis. Sept. 12, 2022) (27,500 jobs); *Smith v. Kijakazi*, No. 22-cv-163-slc (W.D. Wis. July 18, 2023) (17,000 jobs); *Hoskins v. Kijakazi*, No. 1:21-CV-469-TLS-SLC, 2022 WL 17665088, at *8 (N.D. Ind. Dec. 14, 2022) (21,500 jobs); *Dorothy B. v. Berryhill*, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019) (17,700 jobs); *but see Ellis v Kijakazi*, No. 20-CV-719, 2021 WL 3514701, at *5 (E.D. Wis. Aug. 9, 2021) (14,500 nationally was not a significant number). On this record, a reasonable person would accept 23,600 jobs in the national economy as being a significant number.

Wegerer's specific challenges to that finding are not persuasive. First, citing *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014), he argues that the ALJ should have considered his ability to travel as part of her consideration of whether 23,600 jobs is significant. In *Browning*, the court questioned the relevance of jobs in the nation or region given that the claimant—an obese 25-year-old with an IQ under 70 who lived with her mother and whose only work had consisted of three days of part-time janitorial work—was "incapable, by reason of her mental and physical condition" of seeking work outside her small town. *Id*. at 708. But *Browning*'s discussion of the job numbers was arguably dicta, insofar as it was only one of numerous flaws found by the court and was not an issue raised by either party. *Id*. at 708. And even accepting for the sake of argument that *Browning* stands for the rule that an ALJ must factor a claimant's disability-related immobility into the analysis of job availability, Wegerer hasn't identified any such evidence in this case. Wegerer isn't cognitively impaired, he can drive and perform various household chores, and he had past relevant work as an industrial maintenance repairman. Given the vastly different fact patterns, his reliance on *Browning* is misplaced.

Wegerer next argues that the ALJ should have found 23,600 jobs insignificant because it represents only 0.1% of all the jobs in the nation. Once again, however, he cites no case directing the ALJ to determine significance based on a percentage-based approach. In fact, the Seventh Circuit declined to endorse that approach in *Milhem*, 52 F.4th at 695.

Finally, Wegerer argues that the ALJ did not meet her burden of establishing a significant number of jobs that Wegerer could perform because the job numbers in *Wisconsin* were insufficient. As the Seventh Circuit acknowledged, it might be appropriate to consider state or regional job numbers if there is evidence that the jobs listed by the vocational expert "exist only in a few regions of the country where the claimant doesn't live." *DuCharme*, 2022

15

WL 3287974, at *3. But Wegerer hasn't identified any evidence of this sort in the record, and he never asked the vocational expert to provide regional or statewide job numbers. His claim that the numbers are too low is based on his own calculations, which simply takes Wisconsin's percentage of the nationwide population (1.8 percent), and applies it to the 23,600 jobs identified by the vocational expert, to arrive at a total of 425 jobs statewide. As in *DuCharme*, I decline to accept these "back-of-the-envelope" calculations as facts. *Id.*; *see also Sommerfeldt*, 21-cv-83-jdp, Dkt. 22 (holding same).

In sum, the ALJ's finding that Wegerer was capable after he turned 55 of making a successful adjustment to other work existing in significant numbers in the national economy is supported by substantial evidence.

## C. Conclusion

As noted at the beginning of this opinion, whether the ALJ's step five conclusion is supported by substantial evidence is a close question. Both the reliability of the VE's job estimates and the quantity of those jobs lie close to the line, and a different ALJ might have decided this case differently. But where reasonable people could disagree, the substantial evidence standard requires this court to defer to the ALJ. Thin though it may be, the evidence before the ALJ was sufficiently reliable and substantial to support her conclusions. So the decision of the commissioner must be affirmed.

ORDER

IT IS ORDERED that the decision of the Acting Commissioner of Social Security denying Ricky Alan Wegerer's application for disability benefits is AFFIRMED. The clerk of court is directed to enter judgment for the commissioner and close this case.

Entered September 28, 2023.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge